# Exhibit A-7

# 09/04/2025
# Lone Star Sand, LLC's Amended and Restated Petition for Breach of Contract, Nullity of Contract, Personal Liability, and Damages

**STATE OF LOUISIANA * PARISH OF CADDO**
**FIRST JUDICIAL DISTRICT COURT**

**LONE STAR SAND, LLC** **FILED:__________________**

**VS. NO. 654955 "A"**

**WILDCATTER MATERIAL SOLUTIONS, LLC** **__________________ DEPUTY CLERK OF COURT**

**AMENDED AND RESTATED PETITION FOR BREACH OF CONTRACT, NULLITY OF CONTRACT, PERSONAL LIABILITY AND DAMAGES**

NOW INTO COURT, through their undersigned counsel, comes Plaintiff, LONE STAR SAND, LLC, who respectfully shows:

1.

Made Defendants are:

1. WILDCATTER MATERIAL SOLUTIONS, LLC, (hereinafter "Wildcatter") a Texas limited liability company not licensed to do business in Louisiana whose address is 1706 Golf Links Avenue, Cameron, Texas 76520 who may be served through its registered Agent for Service of Process, Registered Agents, Inc., 201 Rue Beauregard, Suite 202, Lafayette, Louisiana 70508;

2. CHAD MIKULEC, a member of Wildcatter, whose address is 1706 Golf Links Avenue, Cameron, Texas 76520;

3. TRAVIS HEMKER, a member of Wildcatter, whose address is 1356 Summit Drive, Winona, MN 55987; and

4. JOSH DECKER, a member of Wildcatter, whose address is 2138 2½ Street, Comstock, WI 54826.

2.

On June 28, 2024, Defendant Wildcatter and Plaintiff entered into a contract for Defendant to provide construction materials and services to Plaintiff. A copy of the contract is attached as Exhibit A.

3.

The contract was for Defendant Wildcatter to provide materials and services to build a dry sand processing and storage facility on the premises of Plaintiff located at Gilliam, Louisiana.

4.

Pursuant to the provisions of the contract, Plaintiff paid to Defendants Three Million Five Hundred Thousand Dollars ($3,500,000.00), leaving a balance on the payment of Milestone 2 under the contract of One Hundred Ninety Thousand ($190,000.00).

Caddo Parish
Filed Aug 28, 2025 1:20 PM
Bailey Barr
Deputy Clerk of Court
E-File Received Aug 28, 2025 1:00 PM
654955 A

5.

The balance of the payment on Milestone 2 has not been paid because Defendant has not completed its performance on Milestone 1 within thirty (30) days from the receipt of the Milestone 1 payment of Two Million Three Hundred Thousand Dollars ($2,300,000.00) as set forth in the Appendix A, Section 1.2 A. 1 of the contract. Specifically, the subcontractor of Defendant did not complete the silos within 30 days nor was the burner for the dryer delivered and installed as set forth in Appendix A.

6.

Further, Defendants were absent during the "Milestone 1" phase of the project and made no efforts to resolve the delays as required in Section 12 of the contract, including, but not limited to, "coordinating efforts with supplier to cure the delay, communicating to Buyer (Plaintiff) the nature of any responsive actions of supplier and anticipated timeframes for curing the delay, and/or seeking a new supplier."

7.

As a result of these breaches, more than 120 days have elapsed since construction of the silos began, and they are still not complete, justifying termination of the contract by Plaintiff under section 12 which is requested.

8.

In fact, due to the faulty and defective construction of the only silo near completion, it partially collapsed during a storm, when, if good workmanship had been used, this would not have occurred.

9.

Defendants were negligent in causing the damage to the silos in failing to properly secure it before leaving the job site and leaving it in a vulnerable position.

10.

In addition, a change order to add a scale to the project for $100,000.00 was supposed to be issued by Defendants, but instead, and without approval or written change order, Defendants had a scale delivered to the site of Plaintiff and issued a change order for plaintiff to approve that

had a price of $150,000.00. Plaintiff never signed the charge order because it was not adjusted to reflect the agreed price of $100,000.00 as Plaintiff was assured by Defendants that it would be.

11.

Under the terms of the contract, Defendants retained a subcontractor, Trinity Trucking and Construction, LLC, to do some dirt work for which Defendants were obligated under the contract, but Defendants have never paid Trinity in full for the work done.

12.

As a result of the faulty workmanship to the silos of Defendants, Plaintiff will incur additional expenses to replace and rebuild the silos at a cost of approximately Four Hundred Thousand Dollars ($400,000.00), yet Defendants have made claims against Plaintiff totaling Five Hundred Eighty-Three Thousand Six Hundred Forty-Six and .30 Dollars ($583,646.30) (See Exhibit B attached).

13.

The above amount includes the following:

* $190,000.00 for remaining work on Milestone 2
* $150,000.00 for the scale added without a change order
* $167,399.50 for labor to operate the sand plant

14.

The first item is subsumed by the amount it will take to cure and repair the faulty work done by Defendants.

15.

The second item is not recoverable under the contract as no written change order signed by both parties was done as required by the contract.

16.

The third item was never agreed to and does not exist under the terms of the contract, or if it does, is contained in the Milestone payments. In addition, while there was some labor agreed to by Plaintiff outside of the contract, this amount was only Sixty-Nine Thousand Four Hundred Eighty-One and .44 Dollars ($69,481.44) (see Exhibit C attached), and this amount is subsumed by the amount it will cost to repair the faulty work of Defendants and complete the job under the contract which Defendants abandoned.

17.

Defendants have threatened to place a lien on Plaintiff's property for the amount claimed, and for the reasons stated above, Plaintiff seeks recovery of any and all damages which may be caused by such lien.

18.

In addition to the amount it will cost to repair the damages caused by the faulty work of Defendants, Plaintiff is damaged in excess of Two Million Dollars ($2,000,000.00) for the amount it will take to complete the unfinished work under the contract that defendant abandoned.

19.

Defendants are liable to Plaintiffs for all injuries and damages incurred by them as set forth hereinabove in such amounts as are reasonable in the premises with legal interest thereon from date of judicial demand until paid and all costs.

20.

Plaintiff has learned through discovery that Wildcatter or its members or representatives did not have a Louisiana Contractor's license at the time it entered into the contract with Plaintiff or during the period of any work performed for Plaintiff in contravention of Louisiana law, and under the longstanding and prevailing law of this State, the contract is an absolute nullity relegating Defendants to recovery of direct expenses only, excluding recovery of any profit.

21.

Alternatively, Plaintiff pleads the nullity of the contract in denial of any contract claims by Wildcatter in its Reconventional Demand and further seeks as damages the return of any of its payment of Three Million Five Hundred Thousand Dollars ($3,500,000.00) which exceeds the actual expenses of Wildcatter.

22.

In addition, Plaintiff seeks recovery of all damages sustained as a result of the faulty work performed, including, but not limited to, the necessary cleanup and repairs from the failure of the silo work and all other damages as are reasonable in the premises.

23.

Defendants' failure to have or obtain a valid contractor's license before entering into the contract and performing work thereunder is a criminal offense under Louisiana law and involves fraudulent and wrongful conduct for which Defendants are personally liable as an exception to limited liability under La. R.S. 12:1320 (D) and the jurisprudence thereunder, rendering the individual defendants liable, personally, for all damages including all payments in excess of the actual costs and expenses of any work performed.

WHEREFORE, Plaintiff, LONE STAR SAND, LLC, prays that this Amended and Restated Petition be filed and that citation be issued herein and that a certified copy of this Petition and Citation be served on Defendants by way of Long Arm Service, and Defendants be required to appear and answer same, and that after due proceedings, there be judgment herein in Plaintiff's favor for such amounts as are reasonable in the premises with legal interest thereon from the date of judicial demand until paid and for all costs of these proceedings.

Respectfully submitted,

HUDSON, POTTS & BERNSTEIN, LLP
1800 Hudson Lane, Suite 300
Monroe, Louisiana 71201
T: 318-388-4400 / F: 318-322-4194
E: rbaldwin@hpblaw.com
E: jsmith@hpblaw.com

**ROBERT M. BALDWIN (#01224)**
**JASON R. SMITH (34981)**
Attorneys for Plaintiff, Lone Star Sand, LLC

**PLEASE SERVE:**

**Wildcatter Material Solutions, LLC,**
**Through its attorney of record,**
**Timothy R. Cook**
**JP Morgan Chase Tower**
**600 Travis Street, Suite 5600**
**Houston, TX 77002**

**AND**

**Chad Mikulec**
**VIA LONG-ARM STATUTE**
**1706 Golf Links Avenue**
**Cameron, TX 76520**

**AND**

**Travis Hemker**
**VIA LONG-ARM STATUTE**
**1356 Summit Drive**
**Winona, MN 55987**

**AND**

**Josh Decker**
**VIA LONG-ARM STATUTE**
**2138 2½ Street**
**Comstock, WI 54826**

**CERTIFICATE OF SERVICE**

I, Robert M. Baldwin, do hereby certify that a copy of the above and foregoing was delivered, via U.S. Mail and/or Electronic Mail, to the following:

Timothy R. Cook
JP Morgan Chase Tower
600 Travis Street, Suite 5600
Houston, TX 77002
E: tcook@bradley.com
Attorneys for Defendant, Wildcatter Material Solutions, LLC

This 28th day of August, 2025.

**ROBERT M. BALDWIN**

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

# CONTRACT FOR THE SALE OF EQUIPMENT AND SERVICES

This Contract For The Sale of Equipment And Services is entered into on June 28, 2024 (the "**Effective Date**") by and between Lonestar Sand, LLC (the "**Buyer**"), a limited liability company organized and existing under the laws of the State of Louisiana and having a place of business at 12145 Cavett River Road, Gilliam, LA 71029; and, WildCatter Materials Solutions LLC (the "**Seller**"), a limited liability company organized and existing under the laws of the State of Texas, with a place of business at 1706 Golf Links Ave., Cameron, Texas 76520 (together, the "**Parties**").

WHEREAS, Seller is engaged in the business of supplying and installing various kinds of sand processing equipment; and,

WHEREAS, Buyer would like to add certain sand processing and storage capabilities at its facility located at 11179 HWY 3049, Belcher, LA 71004 (the "**Facility**" or the "**Site**"); and,

WHEREAS, Buyer desires to purchase certain equipment and services to affect such capabilities; and,

NOW, THEREFORE, in consideration of the mutual promises stated herein, the Parties agree as follows:

**Section 1. Scope of Work**

Seller shall procure and supply the Equipment and Services defined in Appendix A: Detailed Scope of Work. Appendix A, along with this Contract for the Sale of Equipment and Services shall collectively be referred to as the "**Contract**". In the event of a conflict between the terms and conditions contained in any of the above referenced documents, precedence shall first be given to (a) any written change orders executed by both Parties, then to (b) Appendix A: Detailed Scope of Work, then to (c) the terms in this Contract for the Sale of Equipment and Services. Reference in the Buyer's purchase order to any other terms and conditions shall in no way constitute a modification of any of the terms and conditions of the Contract and it shall not be binding unless specifically accepted by Seller in writing. Any changes shall be made to this Contract must be agreed to in writing by Seller and Buyer.

**Section 2. Price**

In consideration of the supply of the Equipment and Services, Buyer shall pay Seller a total price of four million, one hundred thousand dollars ($4,100,000.00) (the "**Contract Price**").

**Section 3. Terms of Payment**

(a) Seller shall submit invoices to Buyer in accordance with the following Project Milestones:

| PROJECT MILESTONE NUMBER | PROJECT MILESTONE | PORTION OF CONTRACT PRICE DUE |
|---|---|---|
| 1 | Execution of this Contract | $2,300,000.00 |
| 2 | Fourteen (14) days after the Effective Date | $1,390,000.00 |
| 3 | Delivery of the Performance Testing Completion Notice (as defined below) | $ 410,000.00 |
| | **TOTAL** | **$4,100,000.00** |



EXHIBIT A

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

(b) Should the Contract Price change between Project Milestones in accordance with this Contract (e.g., by means of a written Change Order), then (a) all subsequent payments shall be based on the amended Contract Price, and (b) on the Project Milestone immediately following the change, Buyer's payment will also include an amount equal to the pro rata amount of the change in Contract Price which would have been due in all previous payments had the change in the Contract Price been in effect since the date of the initial payment.

(c) Invoices shall be due upon receipt by Buyer. If the entire amount set forth on an invoice is not received by Seller within fifteen (15) days of the date set forth on the invoice, the unpaid portion of such invoice shall be subject to an interest charge equal to one and one half percent (1.5%) per month prorated on a daily basis. If Buyer fails to remit payment when due and payment is more than 3 (three) days past the invoice due date, Seller shall have the right to suspend the work. Seller will advise Buyer of intent to suspend within 1 (one) day of payment overdue date. In the event Buyer does not release payments after such notification, Seller will suspend all work and upon an additional five (5) day notification, Seller shall have the right to terminate this Contract. In the event Seller elects to terminate this Contract, the Buyer shall pay cancellation fees as set forth in Section 8 of this Contract in addition to any other remedies available to Seller by law or equity.

**Section 4. Taxes and Duties**

The Contract Price does not include, and Buyer shall be responsible for or provide tax exemption certificates for, any present or future federal, state or municipal sales, use, gross receipts, excise, value added, gross receipts, consumption, franchise, property, or other similar type tax with respect to the Equipment and/or Services provided herein on account of this Contract. Seller shall be liable for any corporate and individual taxes that are measured by net income or profit and are imposed by any governmental authority on Seller, its employees or subcontractors.

**Section 5. Delivery**

Seller shall be responsible for arranging all shipments and shall bear all fees and expenses associated with such shipments, including, but not limited to, those covering preparation of consular documents, freight, storage, and warehouse-to-warehouse insurance. Seller anticipates that Equipment shall start arriving at the Site after Seller's receipt of the full amount of Payment Milestone 1 set forth in Section 3(a). Seller is targeting the delivery of all of the Equipment and the completion of the Services by the later of (a) 30 days from the Effective Date, or (b) 16 days from the date full payment is received by Seller for Payment Milestone 2 (the "**Delivery Date**").

**Section 6. Acceptance and Performance Testing**

Buyer shall accept the Equipment and completion of the Services when Seller demonstrates, via a set of Completed Performance Tests, that the Equipment is capable of reducing the moisture content on an average of 250 tons of frac sand per hour from no more than six percent (6%) moisture content down to no more than one percent (1%) moisture content (the "**Performance Guarantees**"). Seller shall perform, and re-perform if necessary, a four (4) hour test to demonstrate the Equipment meets the Performance Guarantees (the "**Performance Tests**"). At least three (3) different samples of frac sand shall be collected prior to conducting the Performance Test to ensure the initial moisture content of the frac sand to be tested is no more than six percent (6%). Following the drying of the frac sand through the Equipment, at least three (3) different samples of the dried frac sand shall be collected to ensure the moisture content of the frac sand is less than one percent (1%). Seller shall (a) give Buyer at least five (5) days prior written notice

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

in advance of the date on which Seller intends to commence the initial set of Performance Tests, and (b) thereafter give Buyer at least two (2) Business Days notice of all subsequent Performance Tests. Buyer will have the right to be present or represented during such tests. After Seller has performed a Performance Tests during which the Equipment's ability to meet the Performance Guarantees has been demonstrated, Seller shall notify Buyer of the results of the Performance Test in writing (the "**Performance Testing Completion Notice**").

**Section 7. Warranty**

BUYER ACKNOWLEDGES THAT SOME OR ALL OF THE EQUIPMENT IS NOT NEW AND THE CONTRACT PRICE WAS DETERMINED WITHOUT ANY WARRANTIES. THE EQUIPMENT IS BEING SOLD "AS IS WHERE IS" AND SELLER HEREBY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WHERE PERMITTED BY LAW, THE PROVISIONS SET FORTH IN THIS SECTION 7 ARE IN LIEU OF AND SUPERSEDE ANY AND ALL OTHER WARRANTIES AT LAW OR IN EQUITY EITHER EXPRESSED OR IMPLIED.

**Section 8. Termination for Convenience by Buyer**

(a) Buyer may terminate this Contract at any time upon written notice to Seller and Buyer shall pay Seller for all Equipment procured and Services performed before the effective date of termination, plus expenses reasonably incurred by Seller in connection with the termination. The amount due for all work in progress shall be paid for at Seller's standard time and material rates.

(b) The cumulative amount of the Contract Price paid to Seller by Buyer prior to receipt of the termination notice shall be applied to the amount of the foregoing termination charges due to Seller. Title to the Equipment and any work in progress shall remain with Seller in the event Buyer elects to terminate this Contract pursuant to this provision at any time prior to the installation of such Equipment. If the Equipment has been installed, title to such Equipment shall be with the Buyer, not Seller, as consideration of payment of the applicable Contract Price at the effective date of the termination. Termination of this Contract shall not relieve either Party of any obligation arising out of work performed prior to termination.

**Section 9. Termination for Default**

(a) Events of Default: A Party to this Contract is considered to be in default ("Defaulting Party") if:

(i) Either Party becomes insolvent or bankrupt;

(ii) A Party commits a material breach of the Contract which does not otherwise have a specified contractual remedy which shall include a failure to perform in any material respect to this Contract, provided that: (1) the Non-Defaulting Party shall first provide the Defaulting Party with a detailed written notice of the breach and of the Non-Defaulting Party's intention to terminate the Contract, and (2) such Defaulting Party's failure persists uncured for a period of sixty (60) days after written notice thereof. A Party shall not be considered in default if such failure cannot be reasonably cured within such sixty (60) day period and the Defaulting Party promptly commences and diligently pursues such cure

(b) Right to Terminate: If either Party shall be in default of its obligations, the other Party shall notify the Defaulting Party, in writing, and subject to the provisions of Article (9)(a)(ii)(2) above, the Non-Defaulting Party may terminate this Contract after the expiration of the cure period set out in Article (9)(a)(ii)(2), provided that, in the case of a default of the type set out in Article (9)(a)(ii)(1), then this Contract shall be terminated automatically without any further action by either party.

(c) Termination Costs: If Buyer terminates the Contract pursuant to Article (9)(a)(ii), then (i) Seller shall reimburse Buyer the difference between that portion of the Contract Price allocable to the terminated scope and the actual amounts reasonably incurred by Buyer to complete that scope, and (ii) Buyer shall pay to Seller (a) the portion of the Contract Price allocable to Equipment and/or Services completed, and (b) amounts for Services performed before the effective date of termination.

**Section 10. Title and Risk of Loss**

Title to Equipment will pass to Buyer incrementally with respect to each item upon full payment by Buyer to Seller of the amounts invoiced in respect of such work. Risk of loss for the Equipment shall transfer from Seller to Buyer upon Seller' delivery of the Equipment to Site.

**Section 11. Governing Law and Disputes**

This Contract shall be governed and construed in accordance with the laws of the state of Louisiana, without regard to its conflict of laws rules. Any dispute arising under or related to this Contract shall be resolved by a court of competent jurisdiction in Caddo Parish, Louisiana, and each party hereby irrevocably and unconditionally submits to such exclusive jurisdiction and venue. If any action at law or in equity is necessary to enforce or interpret the terms of this Contract, including but not limited to actions to obtain an injunction and/or to defend against claims made by the other party, the prevailing party shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which the party may be entitled. THE PARTIES TO THIS CONTRACT HEREBY WAIVE, RELINQUISH AND FOREVER FOREGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS CONTRACT.

**Section 12. Excusable Delays**

(a) Neither Party shall have any liability, nor be considered to be in breach or default of its obligations under this Contract, for failure to manufacture, deliver or perform to the extent that performance of such obligations is delayed or prevented, directly or indirectly, due to: (i) causes beyond the reasonable control of the delayed Party; or (ii) acts of God, acts (or failures to act) of governmental or military or other authorities, fires, severe weather conditions, earthquakes, armed conflict, acts or threats of terrorism, strikes or other labor disturbances, floods, war (declared or undeclared), unanticipated epidemics or pandemics, civil unrest, riot, supplier delays, delays in transportation, or car shortages. Furthermore, Seller shall not be considered to be in breach or default of its obligations under this Contract for failure to deliver or perform to the extent that such performance is delayed due to the withholding of delivery or suspension of performance in accordance with Section 3, above. In the event of a delay due to supplier delays or delays in transportation, Seller shall make reasonable efforts to resolve the delay, including but not limited to coordinating efforts with supplier to cure the delay, communicating to Buyer the nature of any responsive actions of supplier and anticipated timeframes for curing the delay, and/or seeking a new supplier. The foregoing shall apply even though any of such causes exists on the effective date of the Contract or occurs after the performance of either Party's obligations is delayed for other causes. The delayed Party shall notify

the other Party of any such delay as soon as practicable. If any such cause or excusable event occurs, the date of delivery or of performance shall be extended for a period equal to the time lost by reason of delay, plus such additional time as may be reasonably necessary to overcome the effect of such excusable delay.

(b) If delay excused by this Section extends for more than one hundred and twenty (120) days and the parties have worked in good faith and have not agreed upon a revised basis for continuing the work at the end of the delay, then either party (except where delay is caused by the acts of Seller, in which event only Buyer), upon thirty (30) days written notice, may terminate the Contract in accordance with Section 8 of the Contract.

**Section 13. Change Orders**

Buyer may, by written change order, request changes within the Scope of Work. If any such change results in an increase or decrease in the cost or time required for the performance of the work under this Contract or affects Seller's ability to meet its warranty or guarantee obligations, there shall be an equitable adjustment in the Contract Price or the Delivery Date, or both. Seller shall not be obligated to proceed with the changed or extra work until the price of such change and its effect on the Delivery Date, or on warranties or guarantees, have been agreed upon in a written change order signed by both Buyer and Seller. If a Change Order results in a change in price, all milestone payments shall be adjusted accordingly. If the Change Order results in a decrease in price, payments previously made shall be retained by Seller and applied to subsequent payments as they become due.

**Section 14. Waiver of Consequential Damages/Limitation of Liability.**

NOTWITHSTANDING ANYTHING CONTAINED IN THIS CONTRACT TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR, AND EACH PARTY HEREBY RELEASES THE OTHER PARTY FROM, ANY INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OR LOSSES INCLUDING, WITHOUT LIMITATION, DAMAGES OR LOSSES FOR LOST PRODUCTION, LOST REVENUE, LOST PRODUCT, LOST PROFITS, COST OF SUBSTITUTE EQUIPMENT, FACILITIES, SERVICES OR REPLACEMENT POWER (IF APPLICABLE), LOST BUSINESS OR BUSINESS INTERRUPTIONS, WITHOUT REGARD TO THE CAUSE(S) THEREOF INCLUDING, WITHOUT LIMITATION, PRE-EXISTING CONDITIONS, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, BREACH OF REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED), STRICT LIABILITY, TORT, BREACH OF CONTRACT, BREACH OF STATUTORY DUTY, OR THE NEGLIGENCE OF ANY PERSON OR PARTY INCLUDING, WITHOUT LIMITATION, THE INDEMNIFIED PARTY OR PARTIES, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT AND/OR CONCURRENT, ACTIVE OR PASSIVE OR ANY OTHER THEORY OF LEGAL LIABILITY. NOTWITHSTANDING ANYTHING IN THIS CONTRACT TO THE CONTRARY, THE TOTAL LIABILITY OF EITHER PARTY, ON ALL CLAIMS OF ANY KIND, WHETHER IN CONTRACT, WARRANTY, INDEMNITY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF THE PERFORMANCE OR BREACH OF THIS CONTRACT SHALL NOT EXCEED THE CONTRACT PRICE OF THE EQUIPMENT AND/OR SERVICES UPON WHICH SUCH LIABILITY IS BASED.

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

**Section 15. Insurance**

Seller shall maintain Comprehensive General Liability insurance with limits of not less than $1,000,000 per occurrence for bodily injury or death, and $1,000,000 per occurrence property damage plus Commercial General Liability coverage. Seller shall maintain automobile liability insurance with limits of not less than $1,000,000 for each person, $1,000,000 for each occurrence and $1,000,000 for property damages. Seller shall furnish to Buyer certificates evidencing compliance with all federal and state worker's compensation or similar laws which might impose any charge or liability on Buyer in connection with the work. Buyer shall maintain all risk insurance at site and its insurance policies shall be primary and non-contributory, include a waiver of any rights of subrogation against Seller, and name Seller as an additional insured.

**Section 16. Intellectual Property**

Each party shall retain ownership of all Proprietary Information and intellectual property it had prior to the Contract. All rights in and to software not expressly granted to Buyer are reserved by Seller. All new intellectual property conceived or created by Seller in the performance of this Contract, whether alone or with any contribution from Buyer, shall be owned exclusively by Seller. Buyer agrees to deliver assignment documentation as necessary to achieve that result.

**Section 17. Environmental, Health and Safety Matters**

(a) If, in Seller's reasonable opinion, the health, safety, or security of personnel or the Site is, or is apt to be, imperiled by security risks, terrorist acts or threats, the presence of or threat of exposure to Hazardous Materials, or unsafe working conditions, Seller may, in addition to other rights or remedies available to it, evacuate some or all of its personnel from Site, suspend performance of all or any part of the Contract, and/or remotely perform or supervise work. Any such occurrence shall be considered an excusable event. Buyer shall reasonably assist in any such evacuation.

(b) Buyer shall permit Seller's personnel to operate Buyer's equipment at Site, but Buyer's insurance shall cover the use thereof.

(c) Prior to Seller starting any work at Site, Buyer will provide documentation that identifies the presence and condition of any Hazardous Materials existing in or about Buyer's equipment or the Site that Seller may encounter while performing under this Contract. Buyer shall disclose to Seller industrial hygiene and environmental monitoring data regarding conditions that may affect Seller's work or personnel at the Site. Buyer shall keep Seller informed of changes in any such conditions.

(d) Seller shall notify Buyer in writing if Seller becomes aware of: (i) conditions at the Site differing materially from those disclosed by Buyer, or (ii) previously unknown physical conditions at Site differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract.

(e) If Seller encounters Hazardous Materials in Buyer's equipment or at the Site that require special handling or disposal, Seller shall suspend the performance of any work affected by the hazardous conditions. In such an event, Buyer shall eliminate the hazardous conditions in accordance with applicable laws and regulations so that Seller's work under the Contract may safely proceed. Seller shall properly

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

store, transport and dispose of all Hazardous Materials introduced, produced or generated in the course of Seller's work at the Site.

**Section 18. Confidentiality**

Both parties shall keep all information pertaining to this Contract confidential and shall not disclose such information without the prior written consent of the other party. The foregoing restriction does not apply to information which: (i) is contained in a printed publication which was released to the public by a party prior to the date of this Contract; (ii) is, or becomes, publicly known otherwise than through a wrongful act of the disclosing party, its employees or agents; (iii) is in possession of the disclosing party, its employees or agents prior to receipt from the other party, as evidenced by the disclosing party's written records; or (iv) is, at the time of disclosure, known to the trade or public.

**Section 19. General Clauses**

(a) The waiver by either Party of any breach of any term, covenant or condition contained in this Contract, or any default in the performance of any obligations under this Contract, shall not be deemed to be a waiver of any other breach or default of the same or any other term, covenant, condition or obligation. Nor shall any waiver of any incident of breach or default constitute a continuing waiver of the same.

(b) In the event that any of the provisions or application of any of the provisions, of this Contract are held to be illegal or invalid by a court of competent jurisdiction or arbitrator/mediator, Buyer and Seller shall negotiate an equitable adjustment in the provisions of this Contract with a view toward effectuating the purpose of this Contract. The illegality or invalidity of any of the provisions, or application of any of the provisions, of this Contract will not affect the legality or enforceability of the remaining provisions or application of any of the provisions of the Contract.

(c) This Contract constitutes the entire agreement between the parties and supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written, with respect to the subject matter hereof and has been induced by no representations, statements or agreements other than those herein expressed. No provision of this Contract may be modified or waived unless in writing and executed by both parties.

(d) All rights and obligations hereunder shall terminate, and neither party shall have any further obligation or liability to the other party thereunder, except for liabilities that accrue or are incurred prior to or upon termination and any other rights, obligations, or liabilities that expressly or logically survive termination of this Contract including, without limitation, those with respect to payment, indemnification, waiver of consequential damages, warranty, limitations of liability and confidentiality.

(e) It is expressly understood that Seller is an independent contractor and that neither Seller nor anyone employed by Seller shall be deemed for any purpose to be an employee, agent, partner, servant or representative of Buyer. However, pursuant to Louisiana Worker's compensation law, Seller's employees shall be considered to be statutory employees of Buyer, and Seller will provide full Worker's Compensation Coverage for those employees naming Buyer as an additional insured.

(f) Neither party may assign any of its rights, voluntarily or involuntarily, whether by operation of law or any other manner, or delegate any performance under this Contract to an entity other

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

than an affiliate or subsidiary, without the prior written consent of the other Party. Any purported assignment or delegation of performance in violation of this provision is void. Subject to the foregoing, this Contract is binding upon and shall inure to the benefit of the successors and assigns of the Parties. Seller reserves the right to utilize third party contractors for performance of its obligations under this Contract.

(g) This Contract may be executed and delivered (including with electronic signatures and/or electronical transmission) in any number of counterparts with the same effect as if all signatories had signed the same document. Electronic signatures and electronic copies of manually signed originals shall have the same effect as manually signed originals and shall be binding on the undersigned parties. Each counterpart shall be deemed an original, but all counterparts must be construed together to constitute one and the same instrument.

IN WITNESS WHEREOF the Parties have caused this document to be executed by their authorized representatives.

| SELLER: | BUYER: |
|---|---|
| **WILDCATTER MATERIALS SOLUTIONS LLC** | **LONESTAR SAND, LLC** |
| By: DocuSigned by: [signature] 3982F5D0D9054D4... | By: DocuSigned by: [signature] 2D28DE989173424... |
| Print Name: Chad Mikulec | Print Name: Mark Burns |
| Title: CEO | Title: CFO |
| Date: June 28, 2024 | Date: June 28, 2024 |

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

# APPENDIX A

## SCOPE OF WORK

**1.1 <u>SCOPE OF WORK</u>**

A. The equipment to be provided by the Seller under this Contract (collectively the "**<u>Equipment</u>**") shall consist of the following:

1. Natural gas powered frac sand dry plant capable of passing the Performance Test and processing a max capacity of 300 tons of frac sand per hour under the conditions set forth in the Performance Test. This frac sand dry plant shall consist of:
   (a) Feed Hopper
   (b) Conveyor
   (c) 8'x48' Rotary Drum Counter Flow Dryer, New Burner up to 100MMBTU, Burner will have factory Warranty
   (d) Baghouse and Duct work
   (e) Electrical Room
   (f) Control Room
   (g) Conveyor
   (h) Safety Screen
   (i) Conveyor
   (j) Two (2) Bucket Elevators (one for each silo) and
   (k) Concrete to support silos, scales, dryer and baghouse.

2. Two (2) silos capable of holding 1,000 tons of sand each.

3. Supply of one truck scale.

B. The services to be provided by the Seller under this Contract (collectively the "**<u>Services</u>**"), shall be the following:

1. Installation of Equipment at Site including all cranes and machinery required for the installation and/or construction of the Equipment.

2. Moving of one of the truck scales currently at the Site below one of the silos.

3. Testing at Site to confirm the Equipment passes the Performance Test.

**1.2 <u>SELLER ASSUMPTIONS</u>**

A. To provide the lowest Contract Price possible, Seller has made the following assumptions related to the Equipment and Services such that if any of these assumptions are incorrect, the Contract Price shall be adjusted accordingly:

1. Seller assumes the delivery and installation of the silos and the burner will be complete by the manufacturer of the burner and the silo contractors within 30 days from the date Seller receives full payment of Payment Milestone 1.

2. All pieces of the Equipment will be previously owned and used and will not come

DocuSign Envelope ID: 7A85B7A5-16E9-47C0-A757-9A91C0B9104F

with any warranty. Notwithstanding the foregoing, if there are any warranties associated with any of the pieces of Equipment, such warranties will be passed from Seller to Buyer at no additional charge.

3. Buyer shall have the Site cleared and leveled and Buyer shall have completed all earthworks necessary for the proper installation and construction of the Equipment by the time Seller is ready to begin the installation of the Equipment and the performance of the Services.

4. Buyer, at Buyer's sole cost, shall have at least 400KW of power brought to a junction box or a transformer which shall be located within 500 feet of the location to where the Equipment shall be installed on the Site (the "**Site Power Point**").

5. Seller shall be responsible for, and the definition of Equipment shall include, all electrical labor and materials from the Site Power Point to the rest of the Equipment.

**1.3 ITEMS NOT INCLUDED**

A. The following items and/or services are not contained in the definition of Equipment and/or Service and, if desired, will be charged separately:

1. All required licenses, permits, and regulatory approvals for the delivery, installation, construction, and/or use of the Equipment;

2. Setup and connection of natural gas service to the Equipment;

3. Belts;

4. Any work at Site which is not specifically included as part of the Services, including, but not limited to all clearing, leveling, and earthworks necessary to prepare the Site for the installation and/or construction of the Equipment and/or performance of the Services;

5. Any equipment and/or material which is not specifically included as part of the Equipment including, but not limited to any additional transformers and electrical equipment for running power to the Equipment and the establishment of the Site Power Point;

6. Natural gas and power needed during the startup, commissioning, testing, and operation of the Equipment, including, but not limited to the natural gas and power needed for the duration of the Performance Test;

7. Operational spare parts;

8. Construction power, including but not limited to generators if the Site power is not available at the location where the Equipment is to be installed; and

9. Integration of the Equipment with any of Buyer's existing equipment or systems.

**Rohr Legal, PLLC**
14053 Memorial Drive, Suite 128
Houston, Texas 77079
(713) 816-2471
steve@rohr-legal.com

January 9, 2025

**VIA EMAIL AND CERTIFIED MAIL, RRR**
#9589 0710 5270 2557 7663 82
Lone Star Sand, LLC
Attn: Mark Burns
12145 Cavett River Road
Gilliam, LA 71029
mark@lonestarsand.com

**Re: Outstanding Amounts Owed to WildCatter Material Solutions LLC**

Dear Mr. Burns:

We represent WildCatter Materials Solutions LLC (**"WildCatter"**) in collection matters. As you know, Lone Star Sand, LLC (**"Lone Star"**) entered into a Contract for the Sale of Equipment and Services with WildCatter with an effective date of June 28, 2024 (the **"Contract"**). Pursuant to the Contract, the following amounts are past due:

- $190,000.00 is the remaining amount owed for Project Milestone No. 2;
- $150,000.00 is for the additional scale Lone Star requested to be installed; and
- $167,399.50 is for the additional labor Lone Start requested WildCatter supply to operate the sand plant at 11179 HWY 3049, Belcher, LA 71004 (the **"Property"**).

If the entire amount is not paid to WildCatter on or before January 16, 2025, WildCatter will terminate the Contract pursuant to Section 3(c). As the work under the contract is not complete, if terminated, WildCatter will provide Lone Star a credit in the amount of $333,753.20. When factoring in the credit and amounts previously paid, Lone Star owes WildCatter $266,246.80 of the original $4,100,000 contract price, plus the $150,000 change order, and $167,399.50 for the additional labor. This brings the total amount owed to WildCatter to **$583,646.30** plus interest which is accruing daily. If this amount is not paid in full by the date set forth above, WildCatter has instructed us to file a Statement of Claim and Privilege (i.e. a Mechanic's Lien) on the Property for this amount. Payment should be made out to WildCatter Materials Solutions LLC and sent to:

Rohr Legal, PLLC
Attn: Stephen Rohr
14053 Memorial Drive, Suite 128
Houston, Texas 77079

Pursuant to Section 3(c) of the Contract, all past due amounts are accruing interest at 1.5% per month. Further, should it become necessary to file lawsuit(s) in connection with this matter, we will not only seek the amount now due, but also for all interest owed, attorney's fees, and court costs.

EXHIBIT
tabbies
B

If you have any basis to dispute the amount you owe, please contact the undersigned. Your immediate response is required.

**Rohr Legal, PLLC**

By: [signature]
Stephen Rohr

cc: Randy Allen (randy@lonestarsand.com), Chad Mikulec (cmikulec@wildcinvestment.com), Joshua Decker (jdecker@wildcmaterials.com); Travis Hemker (trhemker@charter.net)

BILL TO
Lonestar Sand LLC
12145 Cavett River Road
Gilliam LA 71029
United States
VAT Registration Number :

| Invoice # | Date | Total |
|---|---|---|
| INV51 | Upon Receipt | $69,481.44 |

| Terms | Due Date | Sales Rep |
|---|---|---|
| | 10/25/2024 | |

| Item | Description | Total Hours | Regular Pay | Overtime | Hourly Rate | Gross Pay | Payroll Tax 8% | WC Insurance 5% | Total |
|---|---|---|---|---|---|---|---|---|---|
| Aggregate Plant Operator Service | Aggregate Plant Operator Service- Hayden Jasnoch - Week 8/31/24 | 15 | 15 | 0 | $ 30.00 | $ 450.00 | $ 36.00 | $ 22.50 | $508.50 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 9/7/24 | 41 | 40 | 1 | $ 30.00 | $ 1,245.00 | $ 99.60 | $ 62.25 | $1,406.85 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 9/14/24 | 40 | 40 | 0 | $ 30.00 | $ 1,200.00 | $ 96.00 | $ 60.00 | $1,356.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 9/21/24 | 53 | 40 | 13 | $ 30.00 | $ 1,785.00 | $ 142.80 | $ 89.25 | $2,017.05 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 9/28/24 | 30 | 30 | 0 | $ 30.00 | $ 900.00 | $ 72.00 | $ 45.00 | $1,017.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 10/5/24 | 76 | 40 | 36 | $ 30.00 | $ 2,820.00 | $ 225.60 | $ 141.00 | $3,188.60 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 10/12/24 | 99 | 40 | 59 | $ 30.00 | $ 3,855.00 | $ 308.40 | $ 192.75 | $4,356.15 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Hayden Jasnoch - Week 10/19/24 | 79 | 40 | 39 | $ 30.00 | $ 2,955.00 | $ 236.40 | $ 147.75 | $3,339.15 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julian C Rey - Week 8/31/24 | 15 | 15 | 0 | $ 30.00 | $ 450.00 | $ 36.00 | $ 22.50 | $508.50 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julian C Rey - Week 9/7/24 | 41 | 40 | 1 | $ 30.00 | $ 1,245.00 | $ 99.60 | $ 62.25 | $1,408.85 |

EXHIBIT
tabbles
C

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julian C Rey - Week 9/14/24 | 40 | 40 | 0 | $ 30.00 | $ 1,200.00 | $ 96.00 | $ 60.00 | $1,356.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julian C Rey - Week 9/21/24 | 52 | 40 | 12 | $ 30.00 | $ 1,740.00 | $ 139.20 | $ 87.00 | $1,966.20 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julian C Rey - Week 9/28/24 | 74 | 40 | 34 | $ 30.00 | $ 2,730.00 | $ 218.40 | $ 136.50 | $3,084.90 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julluan C Rey - Week 10/5/24 | 91 | 40 | 51 | $ 30.00 | $ 3,495.00 | $ 279.60 | $ 174.75 | $3,949.35 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julluan C Rey - Week 10/12/24 | 94 | 40 | 54 | $ 30.00 | $ 3,630.00 | $ 290.40 | $ 181.50 | $4,101.90 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Julian C Rey - Week 10/19/24 | 79 | 40 | 39 | $ 30.00 | $ 2,955.00 | $ 236.40 | $ 147.75 | $3,339.15 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker-NO TIME Week 8/31/24 | 0 | 0 | 0 | $ 30.00 | $ - | $ - | $ - | $0.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker- NO TIME- Week 9/7/24 | 0 | 0 | 0 | $ 30.00 | $ - | $ - | $ - | $0.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker - Week 9/14/24 | 40 | 40 | 0 | $ 30.00 | $ 1,200.00 | $ 96.00 | $ 60.00 | $1,358.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker Week 9/21/24 | 60 | 40 | 20 | $ 30.00 | $ 2,100.00 | $ 168.00 | $ 105.00 | $2,373.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker - Week 9/28/24 | 27 | 27 | 0 | $ 30.00 | $ 810.00 | $ 64.80 | $ 40.50 | $915.30 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker - Week 10/5/24 | 80 | 40 | 40 | $ 30.00 | $ 3,000.00 | $ 240.00 | $ 150.00 | $3,390.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker - Week 10/12/24 | 93 | 40 | 53 | $ 30.00 | $ 3,585.00 | $ 286.80 | $ 179.25 | $4,051.05 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tryston Hemker - Week 10/19/24 | 79 | 40 | 39 | $ 30.00 | $ 2,955.00 | $ 236.40 | $ 147.75 | $3,339.15 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker -NO TIME Week 8/31/24 | | 0 | 0 | 0 | $ 30.00 | $ - | $ - | $ - | $0.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker -NO TIME Week 9/7/24 | | 0 | 0 | 0 | $ 30.00 | $ - | $ - | $ - | $0.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker - Week 9/14/24 | | 40 | 40 | 0 | $ 30.00 | $ 1,200.00 | $ 96.00 | $ 60.00 | $1,356.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker - Week 9/21/24 | | 60 | 40 | 20 | $ 30.00 | $ 2,100.00 | $ 168.00 | $ 105.00 | $2,373.00 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker - Week 9/28/24 | | 27 | 27 | 0 | $ 30.00 | $ 810.00 | $ 64.80 | $ 40.50 | $915.30 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker - Week 10/5/24 | | 57 | 40 | 17 | $ 30.00 | $ 1,965.00 | $ 157.20 | $ 98.25 | $2,220.45 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker - Week 10/12/24 | | 94 | 40 | 54 | $ 30.00 | $ 3,630.00 | $ 290.40 | $ 181.50 | $4,101.90 |
| Aggregate Plant Operator Service | Aggregate Plant Operator Service Tyson Hemker - Week 10/19/24 | | 70 | 40 | 30 | $ 30.00 | $ 2,550.00 | $ 204.00 | $ 127.50 | $2,881.50 |
| | | | | | | | $58,560.00 | $4,684.80 | $2,928.00 | $ 66,172.80 |
| | | | | | | | | Payroll Fee | 5% | $ 3,308.64 |
| | | | | | | | | Total Due | | $ 69,481.44 |

sandyr

CPCC.CV.6012819

# Long-Arm Citation

LONE STAR SAND LLC
VS
WILDCATTER MATERIAL SOLUTIONS LLC

NO. 654955 – A
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA, TO: JOSH DECKER

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.* The petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within THIRTY (30) days after you have received these documents, you must file an answer or other legal pleadings in the Office of the Clerk of this Court at the Caddo Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer or legal pleading within THIRTY (30) days, a judgment may be entered against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this date September 3, 2025.

*Also attached are the following:

______ REQUEST FOR ADMISSIONS OF FACTS

______ INTERROGATORIES

______ REQUEST FOR PRODUCTION OF DOCUMENTS

XX AMENDED AND RESTATED PETITION AND ORIGINAL PETITION

**MIKE SPENCE, CLERK OF COURT**

By: ________________________
Deputy Clerk

ROBERT BALDWIN
Attorney

FILE COPY

sandyr CPCC.CV.6012827

# Long-Arm Citation

LONE STAR SAND LLC
VS
WILDCATTER MATERIAL SOLUTIONS LLC

NO. 654955 – A
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA, TO: TRAVIS HEMKER

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.* The petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within THIRTY (30) days after you have received these documents, you must file an answer or other legal pleadings in the Office of the Clerk of this Court at the Caddo Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer or legal pleading within THIRTY (30) days, a judgment may be entered against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this date September 3, 2025.

*Also attached are the following:

______ REQUEST FOR ADMISSIONS OF FACTS
______ INTERROGATORIES
______ REQUEST FOR PRODUCTION OF DOCUMENTS
XX AMENDED AND RESTATED PETITION AND ORIGINAL PETITION

**MIKE SPENCE, CLERK OF COURT**

By: ______________________________
Deputy Clerk

ROBERT BALDWIN
Attorney

FILE COPY

sandyr CPCC.CV.6012835

# Long-Arm Citation

LONE STAR SAND LLC
VS
WILDCATTER MATERIAL SOLUTIONS LLC

NO. 654955 – A
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA, TO: CHAD MIKULEC

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.* The petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within THIRTY (30) days after you have received these documents, you must file an answer or other legal pleadings in the Office of the Clerk of this Court at the Caddo Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer or legal pleading within THIRTY (30) days, a judgment may be entered against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this date September 3, 2025.

*Also attached are the following:
_____ REQUEST FOR ADMISSIONS OF FACTS
_____ INTERROGATORIES
_____ REQUEST FOR PRODUCTION OF DOCUMENTS
XX AMENDED AND RESTATED PETITION AND ORIGINAL PETITION

**MIKE SPENCE, CLERK OF COURT**

By: ____________________
Deputy Clerk

ROBERT BALDWIN
Attorney

# FILE COPY

sandyr CPCC.CV.6012801

# Long-Arm Citation

LONE STAR SAND LLC
VS
WILDCATTER MATERIAL SOLUTIONS LLC

NO. 654955 – A
STATE OF LOUISIANA
PARISH OF CADDO
FIRST JUDICIAL DISTRICT COURT

THE STATE OF LOUISIANA, TO: WILDCATTER MATERIAL SOLUTIONS LLC
THRU TIMOTHY R COOK, ATTY
,

YOU HAVE BEEN SUED.
Attached to this Citation is a certified copy of the Petition.* The petition tells you what you are being sued for.

You must EITHER do what the petition asks, OR, within THIRTY (30) days after you have received these documents, you must file an answer or other legal pleadings in the Office of the Clerk of this Court at the Caddo Parish Court House, 501 Texas Street, Room 103, Shreveport, Louisiana.

If you do not do what the petition asks, or if you do not file an answer or legal pleading within THIRTY (30) days, a judgment may be entered against you without further notice.

This Citation was issued by the Clerk of Court for Caddo Parish, on this date September 3, 2025.

*Also attached are the following:
______ REQUEST FOR ADMISSIONS OF FACTS
______ INTERROGATORIES
______ REQUEST FOR PRODUCTION OF DOCUMENTS
______

**MIKE SPENCE, CLERK OF COURT**

By: ____________________
Deputy Clerk

ROBERT M BALDWIN
Attorney

FILE COPY